Biohardson, Ch. J.,
delivered the opinion of the court: This action is founded on an alleged contract between the parties arising upon the following facts:
One Pearson, the post quartermaster at Fort Ouster, Montana Territory, was instructed by the chief quartermaster to *65 buy grain in open market for the use of Ms post, and to charge to a contractor who was in default the excess of cost over the contract price.
Pearson thereupon dispatched, January 6, 1882, a wagon-master with teams under instructions to go to the residence of the claimant, about 40 miles distant, and buy oats of him at 6 cents a pound. January 7 Pearson telegraphed to the claimant as follows:
“Custer, 1-7, 1882.
“To J. C. Guy,

“Mchetah:

* * Understand you have oats to sell at six cents per pound. Have authorized Wagon-master Sweetman to take all you will sell. Please answer at once.
“Pearson, Q. M.”
The claimant sent by mail January 8 the following reply, which, in the ordinary course of the mail, reached Pearson January 9:
“Etchetah, M. T.,
“ Jan’y 8th, 1882.
“ Quartermaster, U. 8. A., Ft. Ouster, Mont.:
“Dear Sir: Yours by wire came to hand to-day. The telegraph operator being out, we are compelled to answer you by letter. We can let you have from 70,000 to 100,000 pounds of oats at the rate you agree to pay, and they will be ready at any time you wish them.
“Yours, respectfully,
“John C. Guy & Sons.”
In the evening of the day on which the letter was mailed a messenger from Pearson at Custer reached the wagon-master at Guy’s residence with an order to proceed to Fort Keogh and load his teams there. The wagon-master fed his horses from Guy’s oats that night, and the next morning, taking enough more oats to feed them on his way, in all 2,800 pounds, he proceeded to Fort Keogh, as ordered, with his teams unloaded.
On the latter day, January 9, the claimant went to Fort Custer, saw Pearson and Colonel Hatch, the commandant of the post, and in a conversation together he was told by Colonel Hatch that the latter thought they would need the grain for the reason that he did not think they could keep supplied from a post so distant as Fort Keogh, but he did not promise to take any from the claimant. At the request of Guy and on *66 account of his disappointment, Pearson, by direction of Colonel Hatch, agreed to give the former a lot of sacks which the officers had on hand and for which they were not accountable to the Government, to be taken by Guy at an intermediate place named. The sacks were afterward taken by the claimant and used for sacking his oats.
At the time of these transactions the claimant had on hand at his residence about 70,000 jiounds of oats, and then, or soon afterwards, he made an arrangement with a neighbor, one Mouat, for the purchase of 30,000 pounds of oats, at $4.00 per 100 pounds, to be received and paid for when the Government took them from Guy and paid for them, and not until then.
After these transactions between the parties, in the latter part of January the market price of oats began to fall, and continued to fall to 3 and 2-f cents a pound.
Without making any demand upon the defendants’ officers to take away the oats, and without any previous notice to them, the claimant three months thereafter proceeded to sell, and did sell at private sale all his oats in lots from time to time, at a loss of from 3 cents to 3J cents a pound, and in a settlement of matters with Mouat the latter was in some way allowed from $50 to $100, and the sacks with which his oats were filled, on account of the transaction between them as to the oats which they expected the Government to take.
In the last part of April, 1882, the claimant for the first time gave notice to the defendants of a claitn for damages.
The argument of the claimant is that there was a sale and delivery of the whole quantity of 100,000 pounds by reason of the telegram of January 7, the reply by letter of January 8, and the taking by the wagon-master of 2,800 pounds of oats at the claimant’s granary on the evening of the 8th and the morning of the 9th of January with which to feed his horses, or if that were not a sufficient delivery in law then that a delivery was legally perfected by the subsequent giving of the sacks by the defendants’ officers to the claimant and his filling them with the oats in question.
In our opinion these acts did not constitute a delivery of the whole, but only of the quantity actually taken by the wagon-master. (Elgee Cotton Cases, 22 Wall., 186-192. See also note to case of Thompson v. Gray, 1 Wheaton, 75.)
The claimant further contends that if there was no sufficient *67 delivery to change the title of the property to the defendants, so that the oats were held at the risk of the latter, there was a valid executory contract by which the defendant agreed to purchase the 100,000 pounds at 6 cents a pound, and that not having performed that agreement they are liable to the claimant in damages to be measured by the loss sustained in the subsequent sale on their account.
On the other hand, the defendants contend that the telegram of January 7 to the claimant was not a proposal to buy bats outright, but was only an inquiry as to whether or not the claimant had oats to sell at 6 cents a pound, with notice that a wagon-master had been dispatched with instructions to take, that is, to buy, what the claimant had, and that all the telegram implied was that the defendants would buy only such a quantity of oats as the wagon-master should actually take upon his arrival.
They further contend that as the provisions of Revised Statutes, section 3744, were not complied with there was no valid contract between the parties. (South Boston Iron Company, 18 C. Cls. R., 165, affirmed on appeal, 118 U. S. Li., 37.) That section provides that—
“ It shall be the duty of the Secretary of War, the Secretary of the Ravy, and the Secretary of the Interior to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing and signed by the contracting parties with their names at the end thereof.”
The claimant argues and insists that this section does not apply to contracts for purchases made on account of the failure of a previous contractor to furnish and deliver supplies according to his agreement, when the differences between the cost of the purchases, if less than the first contract price, is to be charged to the contractor, and is no loss to the Government.
These questions are not free from difficulty, and we express no opinion upon them, because, according to our view, the case may be disposed of upon another ground.
Conceding that there was a valid contract created by the telegram and letter in reply, as contended by the claimant, the breach on the part of the defendants, if any, was when the wagou-m aster refused to take the oats under the instruction of the defendants’ officers.
The claimant then had the right and he was bound within a *68 reasonable time to sell the oats on the defendants’ account. Had he proceeded to do so there would have been no loss, as the market price had not then fallen. But the claimant, apparently acting upon the encouragement orally given to him,, that the defendants might take the oats at some future time, delayed three months, when without notice he proceeded to-make sale of the oats at private sale in small lots from time to time without giving notice to the defendants’ officers of any intention to sell for account of defendants for breach of contract.
When a contractor agrees to purchase goods and fails to-accept them, and they remain with the vendor, the measure of damages is the difference between the market value at the-time of making the contract and the breach, if the vendor retains the goods. If the vendor elects to sell the goods on account of the contractor for breach of contract he must do-so within a reasonable time, first giving notice to the contractor that he may take such action thereon as he deems-best. (Chitty on Contracts, 7th ed., p. 594.)
The claimant was not justified in holding the oats three months and then selling them at private sale without notice to the defendants, except at his own risk. By his own conduct he made this election to retain the oats as his own and to hold them on his own acconnt. At that time the value was the same as the contract price, and the claimant suffered no damages.
For the 2,800 pounds of oats which the wagon-master actually took, the claimant is entitled to judgment for their value at the prices agreed, $168; and he will have judgment for that sum.
DATis, J., was absent when this ease was tried and took no-part in the decision.